# Exhibit 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Steven Bartel,                          ) Case No.
                                        ) 2:24-cv-02519-MTM
        Plaintiff,                      )
                                        )
     vs.                                )
                                        )
The City of Tempe, an Arizona           )
Municipal Corporation,                  )
                                        )
        Defendant.                      )
_____ )

DEPOSITION OF NICOLE BURNER
(via videoconference)

January 22, 2026
9:03 a.m.
Tempe, Arizona

GLENNIE REPORTING SERVICES, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130
                              Prepared by:
602.266.6535                  Tara Thomas, RPR
www.glennie-reporting.com     Arizona CR No. 51036

36

week?

A.    Roughly, yes.

Q.    Okay.  To your knowledge, were --

A.    For the most -- for the most part.  For the most part, they all stuck to their hours.

Q.    To your knowledge, were Candice, Rebecca, and Karen full time at 40 hours a week in fall of 2023?

A.    I would assume so.  Again, I don't have it in front of me, so I don't want to speak with certainty. But I would definitely -- I would feel comfortable saying that they likely did.

Q.    And do you know that --

A.    Candice for sure -- Candice for sure because I hired her to be the program coordinator.  So for sure, she would be a 40-hour person.

Rebecca I hired as a family engagement specialist, so she spent a lot of her time doing family engagement.

Karen McNally was the data evaluator -- data evaluator, so I leaned on her.  And the City leaned on her a lot for -- to produce -- and AARP actually -- to attend meetings and to produce our data reports and our -- oh, I forgot what the end of the year -- like just a bunch of data.

Steve oversaw schools.  Allie was our library

specialist, so she attended some meetings with AARP and then also with the language arts coaches and librarians across the board.  She was the librarian, actually, here for the City for a while, to revamp our books, to freshen them up and relate them to the curriculum.

So we have A to Z, which is our curriculum, even though it's not curriculum, but books that the tutors read with the students.  And after every session -- a 30-minute session, we -- the tutors were -- reserved 50 -- five hour -- five -- I'm sorry -- five minutes with each child reading to them.  So it was modeling, you know, fluency and intonation and just expression and, you know, sort of a treat after the child worked 25 minutes working on their own skills.

So those books -- like if the book was about ants or the history of chocolate or whatever it is, Allie worked, like I said, with the librarians to pick out books that were relevant that were also approved by the City.  There -- there's a whole -- or by the district.  I think it was the district.

It was quite obnoxious, to be honest.  Not obnoxious for the reason, but the task was quite cumbersome.  We had to vet every single title to make sure that they aligned or they were okay with the district.

Nicole Burner - 01/22/2026

38

So yeah, she spent a lot of time doing that. And then Pamela oversaw schools like Steve did.

Q.   Okay.  Is that Pamela Bell?

A.   It is Pamela Bell.

Q.   What is Allie's last name?

A.   Burke, B-u-r-k-e.  Her name is Allison, if you needed her officially.

Q.   Thank you.

So Allison and Steve are both listed at 29 hours per week, we can assume; is that correct?

A.   Yes.

Q.   And then Pamela is the only one listed at less than that with 19.5 hours per week?

A.   That's what I see here, yes.

Q.   Okay.  What was your title at the time of this schedule?  So we're looking at fall 2023.  What was your title at that time?

A.   Mmm, I would assume at some point in '23, I became a supervisor.  I -- yeah, because I want -- I -- it's been almost two years of me being out, which would even be '24.  So yeah, I was probably a new supervisor in that year.

Q.   And promotion from the supervisor title that you had held when Steve was your direct report?

A.   No.  I just -- my highest is supervisor.  So I

Nicole Burner - 01/22/2026

81

Q.    And I understand that nobody should be.

But specifically my question was:  Do you recall ever telling Steve to record only the 21 or 22 hours for a week?

A.    Oh, I'm sorry.  I thought I started with no, that's -- I do not recall that.  And the reason being is nobody should be working.  Sorry about that.

Q.    Thank you.  At the time you were his direct supervisor in fall of 2022 and into the spring of 2023, was Steve Bartel the only male site specialist who reported to you?

A.    Probably.  I -- I only oversaw one other person.  His name was James, and I don't think they overlapped.  So what you're saying is probably right.

Q.    Do you know or do you recall was Steve the only male site specialist in Experience Corps during that time?

A.    During that time, yeah.  Correct.  Before then was James.  He oversaw My Brother's Keeper program that I oversaw.  And Experience Corps.  He, too, had two hats, and that was -- but yes, he was before Steve.

Q.    Can you describe your relationship with Pamela Bell during this time, fall of 2022 into spring of 2023.

A.    She was part of the staff.

Q.    Were you friends outside of work?

131

(Recess from 1:33 p.m. to 1:44 p.m.)

BY MS. LOCHER:

Q.   Nicole, do you have an understanding of the rules as they --

THE COURT REPORTER:  I'm sorry.  You cut out.  Can you start over?

MS. LOCHER:  Yes.

BY MS. LOCHER:

Q.   Nicole, do you have an understanding of rules as they would apply to site specialists in 2023 regarding initiating or receiving contact with students, meaning physical contact?

A.   Yes.  Yes.

Q.   Can you describe your understanding of that rule.

A.   Every year when we have tutors trained, there is, I think, a seven-page document that we go through with all of the tutors.  And every site specialist is present.  And it's something we do repeatedly every single year.

The gist of it is never be alone with the kid. If you happen to be at a school with four tutors and you're the one tutor who happens to not call in sick -- not that that happens often -- we ask you to move your child to the library or, you know, a public space,

132

cafeteria, something.

If the child needs to go to the bathroom, do not go with them.  If you -- do not touch any child at all. If they reach for you, as young kids sometimes do, if they try to hug, if you have a chance, put your side and do like this (indicating).  Obviously, we don't want our kids to not feel, you know, that there is some type of affinity of, like, oh, I'm proud of you, you know, or you're like my grandma or your grandpa.

So we actually give that specific example, try and, you know, give a side.  And, like, oh, we're so proud of you, or whatever, and not like a rub, you know. You do a pat.

If they do well, we also say fist bump.  But also be cautious of -- you know, we don't want to do high-fives per se because in case, you know, some kids might be abused, we don't know.  So we'll say like even that, do a, you know, yay, great job, as opposed to, like, hey, high five, you know.

So we are really sensitive and specific about working with the kids across the board.  They're never supposed to initiate that hug, for example, or -- I don't know.  But that's pretty much the extent of what touch you would expect.  It's the, yay, good job, fist bump or give me five.

133

So -- but yeah, there's a whole seven-page document -- I think it's seven pages -- that everybody has to go through, both volunteers and site specialists and me, and everybody.

Q.   So the site specialists in 2023 were not permitted to initiate a hug with a student, but they could receive hugs from students.  Correct?

A.   Everybody, that rule replies to everybody, that you never initiate any touch.  You never encourage a touch.  You never -- you just keep your distance because you never know.  And we really respect the kids and respect our program.  And we didn't want anything to be misconstrued.

So if a child reached out to you for a hug and you had time to just turn your body, that's -- that's the extent of what it -- what we were allowed to do, so ...

And that was everybody, not just site specialists.  This is a training for volunteers and site specialists.

Q.   Do you recall Tutor Theresa James explaining to you a game or a method of -- explaining to you a game played by Mr. Bartel with a student?

A.   No.  I have no idea what you're talking about. Sorry, it --

Q.   Do you recall anyone mentioning to you a

Nicole Burner - 01/22/2026

134

positive reinforcement game played by Theresa James and Mr. Bartel with a student?

A.    I don't ever recall anything and -- no. Nobody's supposed to have --

The reason why I pause is that nobody is supposed to have any games outside of the reading games. And the reinforcement was no stickers, no special books, no -- nothing but, all right, great job.  You should be proud of yourself.  We did a lot of -- we gave them a lot of one-liners that would encourage the ownership of their growth.  And so while everybody likes an attaboy and a good job, how much more pride would the student have if you told them you should be proud of yourself.  You improved here.  You did a good job.

So there were no incentivized games to do anything else.  It was we're going to read this and you're going to do your best.  And I'll -- if you get stuck on a word, I'll help you with that word so you can keep reading.  That was it.

So I don't know of any games of anything.  And nobody should have been playing any games, period, because our program is very, very -- it was a great -- it is a good program.  That's why we are the trainers for all the nation.  It just is very regimented and --

Anyway.  Sorry.  I love the program as you can