# Exhibit 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

STEVEN BARTEL,                          ) Case No.
                                        ) 2:24-cv-02519-MTM
        Plaintiff,                      )
                                        )
     vs.                                )
                                        )
THE CITY OF TEMPE, AN ARIZONA           )
MUNICIPAL CORPORATION,                  )
                                        )
        Defendant.                      )
_____ )

DEPOSITION OF STEVEN LEON BARTEL

September 29, 2025
10:02 a.m.
Tempe, Arizona

GLENNIE REPORTING SERVICES, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130
                                   Prepared by:
602.266.6535                       Tara Thomas, RPR
www.glennie-reporting.com          Arizona CR No. 51036

your house?

A.    Yes.

Q.    In your home?

A.    Yes.  Yeah.  Yes.

Q.    And the notes that you took on September 19th, 2023, what were those notes?

A.    It was -- they described what occurred in my meeting with Ms. Raymond and Ms. Strisko.

Q.    And when did you take those notes?

A.    Right after.  I didn't even -- I did not make it home.  I did not make it to the office.

Q.    Okay.  So where did you take them, then?  Like where were --

A.    I was --

Q.    -- you?

A.    I was sitting outside.

Q.    Sitting outside the HR department?

A.    Yeah.

Q.    What did you take the notes on?

A.    The same notebook.

Q.    So you -- after you brought this notebook home, you brought it back with you in your car?

A.    Yeah.  It was always -- this was a notebook that was always in my briefcase.

Q.    Did you take other notes about facts that you

55

that school to sub for them one -- you know, those -- was it two students?  I think it just ended up being one student at the end.

Q.   So in a typical week, how many times were you tutoring a student?

A.   Boy, one or two, maybe, in a week, yeah.  I don't know if they're -- there might have been a few weeks where I didn't tutor any, but I can't remember too many.  Maybe two.  Maybe two students.

Q.   Did you feel as you were doing the position in 2022, or 2023, that it was -- that you were, as you were saying, you used the word broadening my influence, my knowledge.  Did you feel like the job --

A.   Sharing.

Q.   -- job was providing you that?

A.   Yeah.  I mean, sharing -- sharing my -- well, my influence not really the best word, but -- but my knowledge of kids and, you know -- and then with the kids themselves, if I tutored or observed something -- and something that took place, I could say, here's how you might want to do that.  Or an example would be the tutor was only spending 15 minutes of instructional time, which was the key amount of time, you know.  And would spend the last ten minutes reading to the student.  I'd say, we really got to -- maybe you could push through a few more

56

pages and -- you know.  I get it.  Sometimes the student's tired.  I mean the students bring in their own concerns and issues, and you can -- or if they are not, you know, cooperating as well as the tutor would want and I'm not there, what do I do, Steve?  Well, then, you might need -- so, you know, that kind of thing and how to handle those kinds of situations that come up.

Q.  Aside from tutoring students, in June of 2023, you volunteered to do more work as a site specialist?

MS. PATEL:  Form.

THE WITNESS:  Well, it was actually before that.

MS. PATEL:  I'm sorry.  Form.

THE WITNESS:  Oh.  Oh.

It was before that.  There was one job -- actually, I started -- when I first started in August of 2022, there was one job that nobody wanted to do, and that was doing reference checks for new hires.  And so I started doing those and -- you know, to get everybody going by September because we needed two reference checks.

BY MS. ANCHORS:

Q.  This is for tutors?

A.  This is for tutors.  Thank you.  This is for tutors.

And then, I did it again for the spring of 2023. And I did it again for the fall of 2023. So that is one of those things that -- I guess what made it challenging for me is most of the tutors are female. And here's a guy calling them on the phone. And so I have this speech that I'd lay out, you know, to -- you know, I'm with Experienced Corps. I -- because they had already applied, and we got the application. But I wouldn't get calls back. And occasionally they'd say, oh, well. I just -- I heard a guy's voice, you know. That kind of thing. I heard a guy's voice so, you know, I'm not -- I didn't return your call. I'm sorry.

Eventually, that would happen with many. But I did that, and nobody wanted to do it because you get calls, you know. You do a lot of the reference checking during the day, but you'd get calls in the evening.

Q. As far as --

A. Back.

Q. -- doing a reference check, the people you're calling are not -- I'm confused as to why you're calling the tutors and not the reference.

A. I'm sorry. The tutor's references.

Q. Oh, okay.

A. Yeah. You're right. I mean, I don't know why I said that. I did say that, and why would I say that?

58

It was the tutors.  They would leave references for you to call.  And most of the references were female.  And when that happened, it took a little longer.  But that -- you know, I eventually got through it.

Q.   What types of references were these?  Job references?

A.   Yeah.  It was just how do you know them.  What -- you know, it was -- there were four questions, three or four questions, and then that was it.  And you would just say, I just need a few minutes of your time.  If they said things positive about the person, you'd ask how do you think -- how do you think they would work with young children.  And if it was anything positive, they basically passed.

And sometimes we wouldn't get a reference check, so I would go back to the tutor.  We -- we can't find this individual.  They don't return our call.  Then, you know, I would get another reference from them and then call that reference if needed.  But it was, you know, it was time consuming, but it needed to be done.  And nobody wanted to do it.  Now, that's --

Q.   How did you come to the conclusion that nobody wanted to do it?

A.   Because Pamela Bell went out there and asked people -- and everybody just sat there -- and said, can

59

anybody help Steve with these references?  She had done it before, and she knew how challenging it is.  And I was the new kid on the block, so -- and I -- that's just my summation.  I said, well, fine.  I'll do it.

Q.   Did you ever seek to transfer that job duty to somebody else?

A.   No.

Q.   Why not, if it was so time consuming?

A.   Because I knew how people felt about it.

Q.   Okay.  We've been going for almost -- a little over an hour.

A.   Geez.

Q.   We can take a break now.

Off the record.

(Recess from 11:27 a.m. to 11:40 a.m.)

BY MS. ANCHORS:

Q.   Were there particular times of the year when you felt like you were not able to complete your work in the 29 hours per week?

A.   Yes.

Q.   And what particular times of the year were that?

A.   The beginning.  The first several weeks.

Q.   Of the school year?

A.   Yes.

Q.   So --

63

Q.   -- that week in January 15th?

A.   No.

Q.   Okay.  Over 40 hours in a week in January 2023?

A.   No.  I never worked over 40 hours.

Q.   Okay.

A.   In any week.

Q.   And did you go to -- go -- did you talk to anyone from HR or communicate with anyone in HR about working more than 58 hours in a pay period in January?

A.   Not then, no.

Q.   Not then.

Oh.  Did you have access to the Bridge?

A.   Yes.

Q.   And when I say "the Bridge," that's the --

A.   That main --

Q.   -- intrasite --

A.   Right.

Q.   -- for City of Tempe?

A.   Yes.

Q.   In this lawsuit, you claim that you were discriminated against because you're a man at the City of Tempe; is that correct?

A.   Yes.

Q.   Tell me all the ways that you contend --

A.   All ways.

64

Q.    -- you were discriminated against because you are a man in your job as a site specialist.

A.    I don't know what falls under -- what would fall -- would harassment fall under that?

Q.    Well, I'm asking about discrimination in terms of --

A.    Okay.

Q.    -- treating you differently because you were a man.

A.    If there was a heavy workload, meaning physically, that would usually fall to me.

Q.    What do you mean -- I'm sorry to interrupt you here, but what do you mean workload physically?

A.    Boxes.

Q.    So --

A.    To move.

Q.    -- moving boxes?

A.    Carrying things.  There were several of us it would fall to, but there were people that would never do that.  But I would say the most of it, partly because I volunteered to do it, was the book room.  That was one of my extra duties.

Q.    So as far as moving boxes, was that just in connection with the book room?

A.    Or displays that we were going to do.  Tutor

65

training, you'd bring a lot of materials.  Usually, those kind of things would fall to me.

Q.    Did you volunteer to do those things?

A.    Gladly.

Q.    Who else volunteered to do those things?

A.    Rebecca, it was part of her job.  She had a cart because she was outreach.  Candice.  Mostly Candice is how I recall.  Yup.  Rebecca, too.  I mean, if you would include her job, she was hauling things around.

Q.    And the book room, that's part of your discrimination complaint?

A.    No.

Q.    Okay.  You mentioned the book room.  Why did you mention the book room?

A.    It's in relation to -- I volunteered to fix it up because what would happen is site specialists, some of them would just dump the books in there, and we never had an idea of how many books we would need.  So I organized the book room that summer.  Yeah.  I did -- I took responsibility for that.  And then I took responsibility for, you know, monitoring the books and who had what and who checked out this and that.  I set up like an inventory system so that we would know where the books are.

Q.    Okay.  So I just -- going back to my question of

66

your claim about how you were discriminated in your job --

A. Okay.

Q. -- for being a man. So you're saying moving things, basically?

A. It was -- it was workload. It was workload. It was a number of tutors, a number of students, and the number of schools in total, plus being responsible for all the inventory in the book room and all of the -- because nobody else would do the reference checking.

Q. Did the -- did the schools that you were assigned as the site specialist when you first came on in --

A. In August.

Q. Yeah. Did that -- did those schools, did your assignments change --

A. Yes.

Q. -- during the time you were a site specialist?

A. Not during that first -- the fall, no.

Q. Okay. So the fall of?

A. 2022 --

Q. Two.

A. -- was very reasonable.

Q. Okay. And then, the spring of 2022?

A. Well, in the spring of 2023 --

Q.    Oh.  Sorry.  Spring of 2023.

A.    Believe me, I'm getting -- that was where, yes, my workload with schools and tutors was significantly greater than anybody else's.

Q.    Whose schools -- what new schools were you assigned in the spring of '23?

A.    Wow.  I gotta think.  I had -- all I know is I had three schools, if you count -- you know, the way you count them.  If I have two halves or, whatever, three. And in the spring, I had -- or in -- yeah.  In spring, I had four.

But it was the number of -- because -- because you increase the number of tutors.  And I think I had -- gosh -- 27 tutors versus -- I think everybody else except for Candice had less than 15.  15 or less.

Q.    And this was a situation that you talked to other site specialists about?

A.    Didn't have to.  It was posted.

Q.    As far as how many tutors were at each of their schools?

A.    It's -- they have a bay.  It's called a situation board.  It was on a wall, and it said, here's all the schools.  Here's the number of tutors and who's assigned to what.  So everybody knew.  And that was effective January.  That was in -- on the wall in January

68

of 2023.

Q.   And in the spring of 2023, did that workload shift at all?

A.   Or spring 2023.  During the year, no.  Not -- not noticeably.

Q.   Okay.

A.   We might have had one or two tutors quit.  That was across the whole group.

Q.   What about as far as fall of 2023?  Did the schools that you were assigned shift?

A.   Yes.  I didn't have Scales.  And that was a -- at that time, I think that was considered a half school, but I could -- definitely, I went from four schools to three-and-a-half schools.

Q.   And was that more manageable?

A.   No.

Q.   And why not?

A.   Because it comes down mostly to the number of tutors.  And I had 27 or 20 -- I can't -- but I had 24.  It was the same -- almost the same amount of tutors.  And it was going to be that fall.  And again, the -- let's see.  It was 2022.  Let me step back.  Excuse me.

Spring of 2023, I had more than anybody.  And I had more new tutors than anybody.  In fall, except for Candice, I had -- who was 40 hours a week -- I had more

69

than anybody and more new tutors than anybody. Hopefully, that makes sense.

Q. Do some of the tutors tutor at more than one school?

A. Yes. One that I know of.

Q. Okay.

A. Did you -- yeah --

Q. So when you say 27 tutors, that's 27 people as opposed to --

A. But you would count him at two schools.

Q. Okay. But that's the only one person that you recall did that?

A. Yeah.

Q. Okay. So we talked about workload and moving boxes. Is there any other ways that you contend that you were discriminated against as a man?

A. No, it wouldn't fall under discrimination.

Q. When you said, no, it wouldn't fall under discrimination, what were you thinking of?

A. Sexual harassment.

Q. Do you contend that you were terminated from your employment because you're a man?

A. I'm not sure.

Q. What makes you say you're not sure? Like what makes you say "not sure" instead of no?

A.    I can't -- everything that I would say would be speculative, so I can't be sure.

Q.    Aside from the couple of -- the moving the boxes and then the workload, were there any other ways?  I just want to make sure I've exhausted --

A.    Yeah.

Q.    -- it here.  Any other ways that you're contending you were discriminated against based on your gender?

A.    I would have to say workload, really.  The moving of boxes, I would gladly volunteer to do that.  Yeah, I gladly volunteered.  I had the strength.  I had the height.  I can move -- I was taller than everybody.  I can push the things way up, you know.  I -- fine.

Q.    You do have the height.  How tall are you?

A.    Oh, I'm only 5-10.

Q.    Okay.

A.    But sometimes because I'm so skinny, you know, people are like, oh, you're 6 feet.  No, no.  I wish I was, but ...

Q.    Are there any discriminatory comments that you remember anyone making while you were at -- during your site specialist job?

A.    There might be a comment or two, like, oh, he's a man, he doesn't understand.  That type of thing.  He's

71

a guy.  Oh, you're a guy, you -- you know.  Yeah.  But that didn't come from everybody.

Q.    Who did that come from?

A.    Pamela.

Q.    From Pamela Bell?

A.    Yeah.

Q.    And do you remember what those comments were in relation to?

A.    It was -- she would compare me with her husband in those comments.  That's what my husband does, you know.  That's what he would do.  You know, that I'm this or that.

Q.    Did you ever complain to Ms. -- your supervisor about Pamela Bell making a comment like that about you?

A.    No.

Q.    Did you ever make a comment such as, oh, you wouldn't understand.  You're not a man.

A.    No, I did not.

Q.    You complained to HR about discrimination based on your workload; is that correct?

That wasn't phrased very well.

Did you complain to HR about being discriminated against because you felt that you were being given a heavier workload because you're a man?

A.    I don't believe I used those exact words.  But

72

yes, I did say my workload was significantly more.

Q. When did you make that complaint to HR for the first time?

A. I believe it was in June.

Q. Of '23?

A. Yes.

Q. Was that to Ms. Rios-Chavez?

A. Yes.

Q. Was that by e-mail that you first raised that concern?

A. I recall sending an e-mail to her the evening of the -- because I remember this day. It was the 6th -- yes, June 16th, I met with her. And the evening before, I laid out some of the things that I wanted to talk about. And that may have been in there. So I'm not sure. I can't recall on that one.

Q. And did Ms. Rios-Chavez indicate that she was going to investigate your complaint about discrimination?

A. I don't recall.

Q. When you were meeting with Ms. Rios-Chavez in June '23, was the purpose of the meeting to talk about FLSA violations or --

A. That was most --

Q. Okay. So --

A. Yes. I'm sorry.

73

Q.   -- that was most of that conversation?

A.   Most of that was there.  I mentioned the workload.

Q.   Was the purpose of the meeting to raise the FLSA complaint?

A.   And the -- the second purp- -- yes.  And there was two purposes.

Q.   There were two purposes.  And to your knowledge, did HR look into the FLSA complaint that you raised?

A.   Based on -- I'm just drawing a conclusion.  On 6/28, Nicole Burner brought me into her office with Darcy Zeiger and said that she did not appreciate that I went to AR [sic] and told them about the violation.  So some -- I'm assuming -- I'm not supposed to assume.  Yeah.

Q.   And so 6/28/23, that was after the meeting with Rios-Chavez?

A.   Yes.

Q.   Did you ever hear anything more about the FLSA violation that you raised with HR?

A.   No.  Not from -- no.  From nobody that I can recall.

Q.   Okay.  And the FLSA violation that you raised was Candice Heath working more than 48 -- 40 hours in a week; is that correct?

A.   Yes.

74

Q.    Any others?

A.    I did not mention that there was one other, but I did not mention that individual's name.

Q.    Did you talk with Candice about it?

A.    No.

Q.    Not before going to HR and not afterwards?

A.    Not before or afterwards.

Q.    Do you claim that the city retaliated against you because you complained to HR about discrimination?

A.    Yes.  Yes.

Q.    And what's the complaint to HR about discrimination that you claimed was the precursor to that retaliation?

A.    It -- mostly workload.

Q.    Okay.  So when you complained about workload, when you mentioned it in the June '23 conversation with Rios-Chavez that you were retaliated against after that?

A.    Yes, but it -- yeah.  It was more than just the workload, but yes.

Q.    Can you identify for me each of the times that you felt that you were experiencing retaliation because you had complained about discrimination?

A.    Wow.  Just the -- the definite retaliation was the firing on 6/19.

Q.    So the retaliation that you claim because you

75

raised concerns about discrimination against you was that you were --

A.    Among other things.

Q.    -- fired?

A.    Yes.

Q.    I'm sorry?

A.    Among other things.  Among a number of things, yes.

Q.    Okay.  But I'm talking just about --

A.    Okay.

Q.    Right now, I'm trying to limit it to just retaliation --

A.    Yes, the retaliation --

Q.    The claim that you were retaliated against because you raised discrimination.

A.    Yes.

Q.    And you're saying that it was -- the retaliation was that you were fired?

A.    Yes.

Q.    Okay.  And what leads you to believe that you were fired in retaliation for raising concerns about discrimination?

A.    Because -- I -- I'm not sure I get -- I'm -- get the question.  What -- yeah.  Can you try again, please?

Q.    So you said that you were fired as -- that you

76

were fired in retaliation for having raised complaints about discrimination; is that correct?

A.    That is my understanding, yes.  That's what I believed.

Q.    And --

A.    Nobody said you're getting tired -- fired because we've discriminated -- discriminated against you.

Q.    So what led to that belief?  What are you basing that belief on?

A.    The fact that I had raised it -- first of all, Darcy Zeiger was aware.  And she had discussed it with Nicole, according to her, that my workload was significantly more than anybody else's, and she brought it to the meeting.  She said, look, Candice's seems high. Steve's seems high.  What can we do about it?  Let's troubleshoot.  Nobody had any ideas.  And that's where it was left.

Q.    Okay.  I want to -- as they say -- unpack it a little more.

A.    Okay.  Sure.

Q.    Darcy was aware of blank.  Of what?

A.    That my workload, relative to the other -- at this point -- step back.

Candice was the lead.  She had been promoted to the lead site specialist.  And -- as a 40-hour employee.

77

Compared to all the other site specialists, my load was significantly more, and all the others, site specialists, were female.

And, you know, she didn't blatantly come out and say, look, all the rest of you are female, and Steve's a male.  His workload is almost twice of what yours is.  We gotta do something.  She just said, what can we do about this?  Nobody volunteered to take on another half school, and that's where it lay until she left.  She left her position.

Q.    When was --

A.    Nothing changed.

Q.    When was this meeting you were talking about where no one volunteered?

A.    I don't know -- I've got the chart where she presented it.  And -- it was midsummer, early summer to midsummer.

Q.    Okay.

A.    There was a date on it.  I just can't remember if it was late June or early July.

Q.    So this was before that your assigned schools was reduced from four to three and a half?

A.    Yeah.  It was after that.  Because --

Q.    It was after that.

A.    Yeah.  Because, now, we were looking at a chart

78

with me at three and a half.

Q.   Okay.  And you said Candice's also seemed high?

A.   I remember hers was, I believe, at three and a half as well.

Q.   And then, she was also doing the job --

A.   Lead --

Q.   -- lead site specialist --

A.   So -- but yeah.  It just -- that was -- I don't know if I would -- it may have been Darcy's assessment alone, but I got the sense that they both met.  Meaning, Darcy and Nicole.  To go over that.

Q.   Do you recall if Candice made any statements at that meeting about hers also seemed -- like she wasn't able to complete her work --

A.   Yeah, she did.

Q.   -- her time?

A.   She included me.  She said, Steve and I have way too much.  Something like that.  And nobody piped up to help out.

Q.   And it was because of what happened at that meeting that that informs your believe that you were terminated because you raised concerns about discrimination?

A.   In part, yes.

Q.   Okay.  What's the other part?

A.    Because it had to do with me going to HR.

Q.    Okay.  What do you mean going to HR?  What time?

A.    And blowing the whistle on the overtime.

Q.    So the June '23 meeting that you had with Elva?

A.    Yes.

Q.    Okay.

A.    That started it.  That started part of it at least, yes.

Q.    Who else, to your knowledge, had knew that you went and talked with Elva about your concern about an FLSA violation?

A.    Marie Raymond, Darcy, Nicole.  And I'm not sure if Naomi -- I can't remember her last -- Farrell.

But eventually, Keith Edwards was copied on one of my communications.

Q.    Did you say Keith Edwards?

A.    Keith -- Keith Edwards.

Q.    Do you mean Keith Burke?

A.    Keith Burke.

Q.    Okay.

A.    Keith, yes.  Keith Burke.

Q.    And how did these other folks -- or Marie Raymond, everyone you just listed, how did they know that you went to -- to HR to complain about an FLSA violation?

A.    Because I believe -- let me think.  I'm trying

90

people's backs.

Q.    And then, the second e-mail that you sent September 9th, you directed that e-mail to Elva and to Marie, but you didn't copy Nicole?

A.    Which one was that?  I'm sorry.

Q.    September 9th.  Your follow-up e-mail?

A.    Elva and Marie.  I hadn't heard back.

Q.    From Nicole?

A.    No.

Q.    Okay.  And Nicole was in the office at that time?

A.    Yes.  She was -- yeah.  She was in town.

Q.    Did you understand that -- from HR that they were going to look into the sexual harassment complaint that you brought up?

A.    Not until September 19th.

Q.    September 19th?

A.    Yes.  That -- the day I was fired.

Q.    Okay.  And how did you come to the knowledge that they were going to look into the sexual harassment complaint on the day that you were fired?

A.    They -- Marie said, we will look into your complaint.  Your complaints.

Q.    I want to talk about that September 15th --

A.    Mm-hmm.

91

Q.   -- 2023 meeting.  Was that first time that you had met Adrianne Ward?

A.   Yes.

Q.   Is that the first time that you communicated with her?

A.   Yes.

Q.   What, to your knowledge, was the purpose of that meeting?

A.   The purpose of the meeting was to discuss my complaints.

Q.   Did you write out anything as far as notes or like an agenda or -- to have with you to be like, I want to discuss this, this, and this?  Did you write anything like that?

A.   No, I just -- yeah.

Q.   Did you bring anything with you into that meeting, do you remember?

A.   No.

Q.   How long, do you remember, was the meeting?

A.   It was one-and-a-half to two hours.

Q.   Is that about how long you expected it to be?

A.   I didn't really know.  I mean, I thought it might be a little shorter, but they had plenty of questions to ask, and I just wanted to be truthful with what was going on.  You know, and each one of those -- I

97

A.    She said something like that, yes.

Q.    And that was towards the end of the party?

A.    That was as I was at the door, yes.

Q.    And you said, don't let it happen again; is that correct?

A.    Correct.

Q.    And you --

A.    I might have said, please don't let it happen again.

Q.    Okay.  And you didn't inform HR about this until the August 30th e-mail; is that correct?

A.    That is correct.

Q.    Do you know if anyone else went to HR and talked to HR about the party?

A.    No, I don't.

Q.    The World Market incident in April of 2023.

A.    Yes.

Q.    Nicole Burner was pointing to circus peanuts?

A.    I --

        MS. PATEL:  Form.

BY MS. ANCHORS:

Q.    Do you know if Nicole Burner was pointing to circus peanuts?

A.    I don't know if she was pointing to it, no.

Q.    Were you in her line of sight when she made the

98

comment, when she said the word "penis"?

A.   Yes.

Q.   Where were you?

A.   I was about -- I'm going to guess -- three rows away.  And -- yeah, I was about three rows away.  And if you're going from the back of the store to the front, I was toward the front.  She was towards the back with the snack area where they had all the foods.

Q.   When you say "rows," what --

A.   Yeah.  It's hard --

Q.   -- mean by rows?

A.   Aisles.  I should say aisles.

Q.   Okay.

A.   About three aisles away.

Q.   But the aisles were low so that you could see her?

A.   Yes.  I could see everybody.

Q.   And so she said -- did she say the word circus penis?  Is that what she said?

A.   I heard the word "penis."

Q.   Penis.  Okay.

A.   I --

Q.   You didn't hear --

A.   -- did not hear the --

Q.   --  the word "circus"?

Steven Bartel - 09/29/2025

99

A.   -- word "circus."

Q.   Okay.

THE COURT REPORTER:  And everyone speak one at a time.

MS. ANCHORS:  Sorry.

THE WITNESS:  I am so sorry.  We are both sorry.

BY MS. ANCHORS:

Q.   Did she repeat the word "penis"?

A.   Yes.

Q.   How many times?

A.   At least once.

Q.   Did any other city employees repeat the word?

A.   There was -- I heard it three times.  So she either repeated it twice or somebody else said it.

Q.   Did she appear embarrassed to you when she said the word "penis"?

A.   I couldn't tell.  She was -- I know she was laughing.  Is that -- I supposed that could be embarrassment or -- I don't know.

Q.   And she didn't say anything like I'm so embarrassed?

A.   If she did, I didn't hear it.

Q.   Okay.  Was she looking at you when she said this?

100

A.    No.

Q.    The word "penis"?  No?

A.    No.

Q.    And this wasn't report to HR until -- until the August --

A.    August 30th.

Q.    August 30th?

A.    Yes.

Q.    How come you didn't go to HR about it earlier?

A.    I -- one, I knew that Darcy was coming on board, and I thought, I will be working with somebody new, directly; two, I love working with the kids.  I mean, I just -- you know, I didn't want to give that up and have the opportunity to still -- and this was a perfect job for me.  Part time.  I know a lot about education.  I know a lot about how to work with kids.  I enjoy it.  I get -- you know, I feel a purpose.  There was satisfying a purpose rather than working for BK Assets, for example. And it was convenient.  It was close.  I know the district.  I had worked for the district.  Everything was perfect.  And I wasn't going to let one person take that away.  And knowing that Zeiger was coming in, I felt good.

Q.    Okay.  So you felt like if you went to HR, that you would lose your job?  Is that what you're saying?

114

A.   I said the whole -- you know, the whole thing. These are the rules.  We were there for probably three, four minutes.  Okay?  Elva had gone.

Q.   Why did you start saying these are the rules?

A.   Because I'm going to get there.  Because -- I said, these are the rules because I want you to understand -- and I -- I don't know if these are my exact words, but I -- I've laid out the rules, and I said, now, here's what happened.  And I told basically three things. That when I first met this student, his name was Jayden. I met this student.  He came out and -- he came out, and I had really long, white hair at that point.

Q.   How long?

A.   I mean, I've got pictures.

Q.   Okay.

A.   There's pictures.

Q.   So shoulders?  Below your ears?

A.   Oh, no.  It was longer than this, though.

Q.   Okay.

A.   Actually, now I'm balding at the top here, so I can't --

Q.   Okay.

A.   Okay.  You get the idea.

And I came out.  And the first thing he does -- because he's a talk -- he's just a talkative guy.  He

115

said, hey, can I touch your hair?  I said, sure.  And it turned into the next three times, can I touch your hair?  Sure.  And -- but we were having some difficulty with him at our tutoring sessions.  And by this time, I noticed him in the office a few times sitting there.  And I go, Jayden, what's going on?  I'm in trouble.  And that kind of thing.

And so my goal was to get him to show up for his tutoring.  And so between the tutoring -- now, let's -- let's have this thing.  You know, if -- if he -- so the next time I go pick him up, he says, can I touch your hair?  I said, no.  But you do need to do a good job of tutoring, and if you do, yeah.  And, you know, as unusual as it sounds, that's what we ended up doing.

Q.    How long were you tutoring Jayden?  Like how many weeks?

MS. PATEL:  Form.

THE WITNESS:  Okay.  Well, I'm thinking it started in early February.  He missed three or four sessions, and it went to -- there's record of it somewhere.  And it went to May 8th.  And I don't think he was there on the 6th or the 8th.

BY MS. ANCHORS:

Q.    What school was this at?

A.    Scales.

116

Q.   So you were tutoring --

A.   Or I wasn't tutor, but the tutor was.  I was just sitting there.

Q.   Oh.  So --

A.   I'm sorry.

Q.   I'm confused.

A.   Yeah.

Q.   Were you tutoring Jayden directly?

A.   No.

Q.   So you were sitting with the tutor?

A.   Yeah.  The days I was there, which were most of them because I tried to get -- eventually, because Jayden wouldn't work well with the tutor unless I was there. It's -- I -- you know.  And that he had the opportunity to play this game.

And so the times I was there, and I tried to make most of them, he was absent a few times.  Yeah, I was just there.  Because I was the coordinator, so I was, you know, doing the usual coordinator thing, checking the -- you know, for both -- because I had tutors on Monday, Wednesday and Tuesday, Thursday there, and I had more on Monday, Wednesday.  And I had just these two.  So I was check their files and checking -- you know, doing some paperwork, maybe texting and responding while I was just sitting there waiting.

117

Q.    So were you -- you were not sitting at the table with Jayden and his tutor while Jayden was receiving tutoring; is that right?

A.    Right.  I wasn't.  I did sub one time when she couldn't make it.

Q.    So in this game, when would Jayden get to touch your hair?

A.    After.  After the session.

Q.    At end of tutoring?

A.    Yes.  He'd come, and -- I mean, we were very strict because, you know -- you don't want problem -- first of all, she was there.  You had to have two people there at all times.

Q.    Two people where?

A.    Two people in the room.  Two adults.  The tutor -- either two tutors, or a tutor and the tutor coordinator.

Q.    And who is the tutor coordinator?  You mean, the site specialist?

A.    I mean me, yeah.

Q.    All right.

A.    Okay.  Site specialist.

Q.    Earlier you were saying there were like 11 tutors, something like that, at a school?

A.    Yeah.

119

Q.   Do you recall when you were speaking with Adrianne and Elva if you explained all of this about there was a tutor with -- there was a tutor with Jayden and that you were doing other work and there was --

A.   No.  Not all of that.

Q.   -- at the end of tutoring?  Okay.

A.   I'm sorry.  I jumped in again.

Q.   Did you ever ask anyone if this game was okay?

A.   Yes.

Q.   Who did you ask?

A.   Oh, I didn't ask.

Q.   Oh.

A.   I went with the assumption that it was because I followed the rules.

I told Darcy shortly after she was hired -- I think it was at the end of April -- that I've got this -- it's just -- it was kind of a funny -- you know, hey, I gotta tell you this one.  Because she was just starting. This is a funny story, and -- and Nicole wanted her to go to Scales school to get a sense because my school, again, was the closest one that was still open.  And to observe what it's like to be a tutor coordinator and a tutor.  So I told Darcy, and I said this is what's happening, and she kind of laughed.  And then, Nicole didn't know anything about it until Nicole and Darcy showed up.  I

Steven Bartel - 09/29/2025

120

think it was May 6th.

Q.   They came to Scales?

A.   Yes.  And -- to observe.

Q.   I was asking if the -- for Jayden to guess if your hair was dirty or clean?

A.   Yes.

Q.   Did you tell Ms. Ward and Ms. Rios-Chavez that was part of the game?

A.   Yes.

Q.   Who came up with that part of the game?

A.   I don't remember who was -- I think it was me. And Theresa -- you know, I said, hey, sounds good. Jayden was -- Jayden was a competitive man -- young man.

Q.   So after you -- after you said this, then you're saying Elva left, and then you were still standing in the hallway with Adrianne.  Why were you still standing in the hallway?

A.   Because Adrianne -- that's when I know -- why do you love your job?  And then, so what turns you on about your job?  That's when that question for sure was with just Adrianne there.

Q.   Okay.  And what did you say?

A.   I repeated part of what I said.  I said, I'd already given you the example and that I enjoy giving back to the community.  I mean, there were three things.

Steven Bartel - 09/29/2025

122

show their appreciation in different ways.  And this is one.  Sometimes you do a high five.  Sometimes they hold up their hand, you know.  A low five, Mr. Bartel.  You know, that's the kind of things they did.

Q.  And then, you met with -- or how did it -- after you talked with Adrianne, how did the conversation in the hallway end?

A.  She -- she said -- or I -- yeah, I think she brought up, well, are you going to the game this weekend?

Q.  The ASU game?

A.  Yeah.  And I said, yeah.  And -- okay.  See ya. Bye.

Q.  And then, you met with Rebecca Strisko and who else was --

A.  Marie --

Q.  Marie Raymond?

A.  Yes.

Q.  Who -- and you met with them in person?

A.  Yes.

Q.  Both of them?

A.  Yes.  I got the call from Elva.  She said, come over here.  We need to talk to you some more.

Q.  You --

A.  But when I got there, it was not Elva.  Yes.

Q.  Can you tell me everything that you recall about

123

that meeting?

A.    Yes.

I said -- Marie started and said, we are calling you here because you violated your contract.  And I go -- the contract you signed.  And I said, I don't know -- well, tell me -- you know, or something -- tell me more.  And she said -- somewhere in there she said, we're still going -- or we're going to let you go, or something.  And we're still going to investigate your complaints.  And then, I said, well, what -- why -- what did I do?  What did I -- you know, something like that.  And Strisko jumped in and said, well, we have two people here that said you enjoy receiving hugs or getting hugs, or you enjoy getting hugs.  I don't know.  It was -- and so I just said, here's the rules.

And then they brought up the clean hair versus dirty hair without any explanation than that -- other than that.  And I said, well, here's, you know, what -- and I started to explain.  And they said, you violated the contract.  You are -- not Rebecca.  Marie said, we believe you're a risk and you're terminated, or something along that line.  And I said, you know -- or she even said something like is there anything else you want to say.  I said, no, I don't have anything else to say.  It was very short.

125

A.   Yes, it was a happy hour situation.  That was just after Darcy -- I think it was shortly after she came.  And I think it was also close to her birthday or something.  And so that was a get-together with -- with everybody.  That was after hours, though.

Q.   You claim that you were regularly berated, humiliated, and chastised because you're a man.  Is that true?

A.   I don't know if I had said it was a man, but --

Q.   Because you were a man, not by a man.

A.   Oh, yeah.

Q.   Sorry.

A.   No, no.  And I interpreted what you said right.

I guess there was one individual that would get away with it more than others.  And -- and it appeared to me because it was me, but partly because of her friendship with Nicole Burner.

Q.   Is this Pamela Bell that you're talking about?

A.   Yes.  Yeah.

Q.   And what about her comments were -- did you perceive were directed at you because you were a man?

A.   It would be -- there was some -- I don't think there were just because I was a man, but it was just the negative -- general negative comments about men in general.  I don't know how -- you know.  Let's see.  You

126

don't know.  I keep saying "you know."

Oh, that's -- for example.  Oh, that's just another guy thing.  Or that's -- you know, that's what a guy would do.  But it was all -- it was in a negative kind of a tone towards me or towards guys in general.  It was just kind of an atmosphere that was accepted.  Rebecca Alvarez never did anything like that.

The other individual that would do that was Karen McNally.  And the one comment that stuck with me the most was when we were at the bar the evening.  And I leaned over to her and said, I'm just getting tired of this, you know, with all the comments about the genitalia, you know.  How they -- how it looked like this food, looked like that.  And, you know, it was just a lot of laughter and that kind of thing.  And I said to her, I said, I am really getting tired.  This is getting old.  Something like that.  And she said, well, now you know what it's like to be a woman.

Q.   And the comments were -- there were comments being made about a dessert that was brought out that looked like balls?

A.   It could have been a dessert.  It was more of an appetizer kind of thing.  It wasn't like we were getting together for dinner.  So it could have been an appetizer or a dessert, yeah.  Yes.