# Exhibit 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

STEVEN BARTEL,                    )
                                  )
            Plaintiff,            )
                                  )   2:24-CV-02519-MTM
    vs.                           )
                                  )
THE CITY OF TEMPE, an             )
Arizona Municipal                 )
Corporation,                      )
                                  )
            Defendant.            )
_____)

DEPOSITION OF ADRIANNE WARD

Phoenix, Arizona
September 11, 2025
8:30 a.m.

**REPORTED BY;**
Herder & Associates, LLC
Kristen Brown, RPR
Certified Court Reporter
AZ-CR No. 50708

73

Q.    Sorry to interrupt you.  Who called you?

A.    Nicole Berner.

Q.    What day did she call you?

A.    It would have been September 1st.

Q.    Did she call you before you received the emails?

A.    Yes.

Q.    Was she the one who forwarded you those September 1st emails?

A.    Yes.

Q.    What did you discuss with Nicole Berner during that phone call?

A.    So her reason for the phone call was she was calling because she wanted to terminate Mr. Bartel that day.

Q.    Why did she want to terminate him that day?

A.    So that was most of my conversation with her. So she referenced some of his behavior that he had displayed, specifically that he challenged her in her supervisory role, that he had complained about some of the working conditions, that he was insubordinate and would not follow direction that she had provided to him, and then referenced the incident that occurred on August 17th.

Q.    Which was the altercation between Ms. Bell and

74

Mr. Bartel, correct?

A.   Correct.

Q.   What complaints did Ms. Berner say that Mr. Bartel had made regarding his working conditions?

A.   She referenced that there had been numerous conversations with Human Resources, specifically Elva, about his assigned hours, and that he had complaints, questions, related to lookback periods, what his hours of work were.  And related to the insubordination piece, that she had -- he apparently had been talking to other employees about what their benefits and work hours were.  Can you repeat your question.  I want to make sure I...

Q.   I'll follow up and ask additional questions.

A.   Okay.

Q.   Was it a violation of the City's policies and procedures for Mr. Bartel to be discussing hours and benefits with other employees, to your knowledge?

A.   No.  And that's what I told Ms. Berner, that that was not an appropriate reason to terminate, and that he had a right to ask questions about his work hours and to discuss that with other employees should he choose regardless of direction that she provided.

Q.   Do you recall any other details?  You said that Ms. Berner complained that Mr. Bartel challenged

89

that led to the part one discipline?

A.    I would say that these weren't complaints by her employees that led to the part one discipline.

Q.    Do you know what led to the part one?

A.    It was information that Ms. Rios-Chavez and I provided at the conclusion of our various interviews with the employees within that section.

Q.    And what was that investigation about?

A.    Well, it was specifically related to the complaints that Mr. Bartel provided to us.

Q.    When did the investigation into Mr. Bartel's complaints conclude?

A.    I could not give you an exact date that it concluded, but I do know that -- I'm going to reference the calendar.  So Ms. Rios-Chavez and I met with Mr. Bartel on September 15th, which was a Friday.  As I stated, she returned to the office on either Tuesday or Wednesday, the 12th or the 13th.  I think it was the 13th.  And at some point, we were told to have that intake meeting with him.  And then in subsequent weeks, we met with other staff members within that division.

So I don't know offhand what the dates of each interview was that we conducted, but it would have been in this two, maybe three-week time frame.

Q.    Do you remember the individuals that you

interviewed in relation to the investigation of Mr. Bartel's complaints?

A.    Yeah.

Q.    Can you list those for me.

A.    Karen McNally, Allison or Ally Burke, and Pamela Bell.  And Ms. Rios-Chavez spoke to Darcy Zeiger, and I believe she spoke to her on the 14th or 15th, but I was not involved in that conversation.  And it took place over the phone, if I recall.

Q.    Who conducted the investigation into Mr. Bartel's complaints?

A.    Ms. Rios-Chavez and I did.

Q.    Was anyone besides Ms. Berner disciplined for the findings of that investigation?

A.    Not that I'm aware of, no.  And to clarify, all of the three that I named, with the exception of Ms. Zeiger, were temporary employees.  And Ms. Zeiger's last day of employment was September 15th, if I recall correctly.

Q.    What were the conditions of Ms. Zeiger's separation from the City of Tempe?

MS. ANCHORS:  Foundation.

BY MS. LOCHER:

Q.    If you know.

91

A.    I mean, it wouldn't come to me specifically. I believe it was a voluntary resignation.

Q.    Can you describe what were the findings of the investigation of Mr. Bartel's complaints as they related to Ms. Berner?

A.    Yes.  We found that there were inappropriate meetings that were held at temporary employees' houses that there were training meetings, that there was -- so in the findings, we basically summarized what our various meetings were with the employees.  So we combined all of the information, not just from Mr. Bartel's complaint, but we summarized what the meetings were with the various other employees, and then presented that to the department.

So that was one of the things that had come up, that I recall very specifically.  That was one of the findings, but it wasn't really, like, Here are policy violations; it was, Here's all of the information and just, kind of, presented back to the department.

Q.    You said there were meetings held at temporary employees' houses?

A.    Meetings and trainings, and a training that was a training/holiday event of some sort, and lunches.

Q.    Do you recall any of the dates of the meetings

137

Q.   So the second statement where he said he got turned on, she found that more problematic or concerning, and you were more focused on the hair touching game; is that accurate?

MS. ANCHORS:  Foundation.

THE WITNESS:  I don't know what she was focused on other than what she told me and what I told her.  And so the reason why you would have two people in a meeting anyway is to catch different things that one may not hear or register where the other would.

BY MS. LOCHER:

Q.   Did you or Ms. Rios-Chavez make any other comments about the meeting, or Mr. Bartel, during that lunch or on the way to or from lunch?

A.   No.

Q.   What did you do when you got back from lunch?

A.   I went back to my office.

Q.   Did you have any conversations with anyone else about Mr. Bartel?

A.   Yes.

Q.   Who was that?

A.   Ms. Rebecca Strisko.

Q.   And was that a phone call or in person?

A.   It was in person.  Her office is directly next to mine.

138

Q.   And what did you discuss with Ms. Strisko?

A.   She initiated the conversation and asked, How did the meeting go with Mr. Bartel?  And I said, Well, he did say something that I found to be -- I think I had said, We didn't get anything different other than we got more in-depth, but that he had said something that I found to be odd, and told her about the child statement, the touching hair statement.

And then I told her, and Elva pointed out, that he had made the second part of the statement about the hugs and the getting turned on.

Q.   Was Elva a party to this conversation with Strisko?

A.   Not at this point.

Q.   Okay.  So it's just you and Ms. Strisko talking.  And what was her response to your comments about what you found odd about the meeting?

A.   She told me to call Ms. Rios-Chavez into my office.

Q.   And did you?

A.   Yes.

Q.   Do you know about what time that was?

A.   I don't.  I don't know what the time frames were.  This obviously was towards the latter half of the day.

Q.    So Ms. Rios-Chavez then came into your office, I assume?

A.    Yes.

Q.    And the three of you are in your office?

A.    Yes.

Q.    And then what did you discuss from there?

A.    She asked Ms. Rios-Chavez what she had heard. And she repeated the statement.  The -- Ms. Rios-Chavez and I talked about how I had heard the first part, she had heard the second part; and it wasn't until we kind of were walking out and mentioned, I think that's weird that it came up.  And so that was what we were talking about.

Q.    Okay.  And so comments were made that it was weird.  And did Ms. Strisko then advise you on what to do next?

A.    Not at -- no.

Q.    How did that meeting in your office conclude?

A.    Ms. Strisko called either Naomi or Mr. Keith Burke on her cell phone and told them what we had just told her.

Q.    While she was in your office?

A.    Yes.

Q.    So were you present for her conversation with either Naomi or Burke?

141

of my office still on the cell phone.

Q.   Okay.

A.   And, again, her office is right next to mine.

Q.   Okay.  Did either you or Ms. Rios-Chavez mention the word "grooming" to Strisko in your office meeting before she made that call?

A.   No, I don't -- I don't recall.

Q.   After she left your office, did you and Elva Rios-Chavez discuss anything else?

A.   Ms. Strisko directed us to put what was said into an email.  And I told Elva I would create a note to file, and forward it to her for her to do with it what she would.

Q.   So Strisko told you to put it in writing in an email?

A.   Yes.

Q.   And she gave that direction to each -- you and Ms. Rios-Chavez while she was in your office with you both?

A.   I recall it being at that same time frame, yes.

Q.   Did Strisko instruct you to send your email to Ms. Rios-Chavez first -- strike that.

MS. ANCHORS:  Form.

BY MS. LOCHER: